THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TAMMY L. MOBERG, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 06 C 5689 |
| | ) |
| v. | ) Magistrate Judge |
| | ) Arlander Keys |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of the Social | ) |
| Security Administration, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Tammy L. Moberg, moves this court for Summary
Judgment, pursuant to Rule 56(a) of the Federal Rules of Civil
Procedure, to reverse or remand the final decision of the
Commissioner of Social Security (the "Commissioner"), who denied
her claim for a period of disability and Disability Insurance
Benefits ("DIB"). 42 U.S. C. § 401 et seq. (West 2007).
Defendant Commissioner has filed a Cross-Motion for Summary
Judgment. For the reasons set forth below, the Court grants
Plaintiff's Motion for Summary Judgment, in part, and denies the
Commissioner's Cross-Motion for Summary Judgment, and remands the
matter back to the Commissioner for further proceedings
consistent with this Opinion.

## Procedural History

On May 25, 2004, Ms. Moberg filed an application for a
period of disability and disability insurance benefits, alleging

disability beginning February 1, 2004. Her claim was initially denied on August 17, 2004 and was denied again on January 14, 2005, upon a petition for reconsideration. The plaintiff timely filed a request for a hearing before an Administrative Law Judge ("ALJ") on February 17, 2005. On March 13, 2006, a hearing was conducted before ALJ Robert M. Senander, where the plaintiff appeared with her attorney.

In a decision dated April 21, 2006, the ALJ determined that Ms. Moberg was not disabled; and therefore, not entitled to social security disability insurance.

On August 18, 2006, the Appeals Council denied the plaintiff's request for review of her claim. The Appeals Council's denial of review rendered the ALJ's decision the Commissioner's final administrative determination. As a result, the plaintiff commenced this action seeking the reversal of the Commissioner's final decision or in the alternative, remand for further proceedings.

## Factual History

### 1. The Plaintiff's Background and Testimony

Tammy L. Moberg was born on December 11, 1967 and was 38 years old at the time of the ALJ's decision.[1] She stands

---

[1]The Court notes that although the plaintiff testified at the hearing she was 39 years old, she was actually 38 years of age at the time of the actual hearing in March of 2006; however, this discrepancy is of no consequence and does not impact the decision of the Court.

approximately 5 feet 4 inches tall and weighs about 235 pounds.
She also is married and lives with her husband and three
children. The plaintiff attended high school until the tenth
grade and subsequently obtained a GED in May of 1996. Ms. Moberg
worked in a freight forwarding company from April 1997 to April
1998. She then worked as a sales associate in 1998 and then as a
laborer in a warehouse in May of 1999, but it is unclear from the
record for how long. From 2000 to 2003, the plaintiff worked for
a gas company where she served mostly as a sales assistant. At
the hearing before ALJ Senander, Ms. Moberg testified that the
onset date of her disability was February 2004 and she has not
worked since 2003.

At the hearing, the plaintiff offered testimony explaining
her physical limitations and impairments. Ms. Moberg stated that
she has difficultly sitting or standing for more than an hour,
because her knees stiffen up and start swelling, and she also
feels pain in her neck. She further testified that the pain is
constant and she is on prescription medication, including
Vicodin, which she takes when the pain is unbearable. She is
also taking Lovadop for restless leg syndrome, along with Benicar
HCT and Norvase, which treats her high blood pressure. According
to Ms. Moberg, she can stand for 20 minutes until her back and
knees begin to hurt. She also claimed that she can walk for
approximately 15 minutes and then her knees and the lower part of

3

her back start to hurt. She further explained that it is painful
to climb stairs, so her husband built a bathroom upstairs to
accommodate her condition. The plaintiff also testified that she
can no longer go grocery shopping. According to the plaintiff,
the heaviest item she lifts is her two pound purse, but she is
able to lift a gallon of milk onto the counter without any sign
of distress. She further testified that during the summer of
2005, she was no longer able to lift her 20 pound grandchild
because it caused pain in her shoulder. The plaintiff also
claimed that she sleeps restlessly at night, and a couple of
times per night, needs to get up in the middle of the night to
walk around. She further explained that she tries to read books,
but often forgets what she has just read. Moreover, she
testified that since she has been taking medication, she is
experiencing some forgetfulness, such as forgetting to take meat
out of the freezer or appointments. The plaintiff also testified
that she does not have any hobbies or participate in any
activities.

## 2. Testimony of Vocational Expert

At the hearing, Mr. James Breen categorized the plaintiff's
past work experience as follows: (1) her job as a expediter is a
SVP six, semi-skilled in the sedentary work group category; (2)
as a retail sales clerk is a SVP three, in the semi-skilled,
light work group category; (3) as a warehouse worker is a SVP

two, medium work group category. (Hr'g Tr. 251). At the hearing, the ALJ posed the following hypothetical to Mr. Breen: whether a person of 39 years of age, with a GED education, who could lift ten pounds frequently, twenty pounds occasionally, can stand an eight-hour day, sit six hours in an eight-hour day, with a sit/stand option every forty-five minutes, occasional stairs, no ladders, occasional stoop, crouch, crawl, and requiring the occasional balance, could perform the work history as outlined above. (Hr'g Tr. 252). Mr. Breen concluded that the person in the hypothetical could perform the plaintiff's past work as an expediter because it was sedentary. (*Id.*) He further explained that besides the work history outlined above, the hypothetical individual could also do some unskilled sedentary occupations, such as a charge account clerk, security guard and a surveillance system monitor. (Hr'g Tr. 253). The number of positions available in the Chicago and "the standard metropolitan and surrounding areas" for these three jobs range from 5,000 to 31,000. (*Id.*) VE Breen also testified that an employee's ability to concentrate and focus, along with any pain an employee is experiencing, would impact the manner in which a person could do their work even in the sedentary category. (Hr'g Tr. 254).

### 3. Medical Evidence

From March to May 2004, after the onset of her alleged disability, Ms. Moberg's blood pressure ranged from 138/90 to

150/76. (R. 132-35). On March 15 and April 12 of 2004, she saw Dr. Peter Starrett and was prescribed Norvase to control her blood pressure and Wellbutrin XL. (R. 134-35). She also complained of pain and swelling in her left knee. (R. 135).

On April 13, 2004, Ms. Moberg underwent an MRI Scan of her left knee. After an examination of the MRI, Dr. Rafia S. Saleem found that the plaintiff had no significant joint effusion, her menisci were of normal morphology and signal intensity, her cruciate and collateral ligaments were normal, and her quadriceps and her patellar tendons were normal. (R. 139). Dr. Saleem, however, did identify erosions involving the patellar apex and the medial facet and found these findings consistent with Grade IV chondromalacia of the patellar apex. Additionally, Dr. Saleem identified an approximately 6-8 millimeter ganglion at the site of the femoral attachment. (R. 140, 139).

A subsequent bilateral knee examination conducted by Dr. Troy R. Karlsson showed normal motion, no strength deficits or atrophy, and no effusion, swelling or erhthema. (R. 143). The plaintiff's bilateral hip motion was normal and she had a normal gait. Dr. Karlsson reviewed Ms. Moberg's MRI of her knees and concluded that she had Chondromalacia patella. Dr. Karlsson's recommended treatment was physical therapy and possibly with bracing. (R. 144).

Ms. Moberg attended physical therapy from May 2004 to June

6

2004. In total, she received four sessions of treatment and missed eight sessions. (R. 179). The plaintiff's last session was on June 11, 2004, in which the physical therapist noted that Ms. Moberg had a poor VMO and was inflexible, but her progress was difficult to measure, because the plaintiff's compliance was an issue. (Id.) The physical therapist also noted that the plaintiff had not returned phone calls regarding re-scheduling of appointments. (Id.)

On July 13, 2004, Ms. Moberg visited Dreyer Medical Clinic with complaints of excessive menstruation. During a gynecologic examination, it was determined that she stood 5 feet 3 inches, weighed 204 pounds, had a blood pressure of 130/74 and a pulse of 72. (R. 161). The examiner, a nurse practitioner("NP"), noted that Ms. Moberg appeared well, her vital signs were normal, her thyroid was not enlarged, her heart sounds were normal and without murmur and she moved all extremities freely. (R. 162). The NP's final assessment was that the plaintiff's gynecologic exam was normal, but that she suffered from obesity, tobacco abuse, and menometrorrhagia. The NP also later notified Ms. Moberg that her lab results showed that she was a little anemic and recommended that she start taking Iron 325mg twice a day. (R. 161).

The State Agency examiner, Dr. Pilapil Virgilio, conducted an RFC on August 3, 2004. After examining the plaintiff, Dr.

Virgilio opined that she could occasionally lift 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for a total of at least 2 hours in an 8-hour workday, sit for a total of 6 hours in an 8-hour workday, and found her ability to push and/or pull unlimited, other than what is identified above. (R. 147). Dr. Virgilio further opined that the plaintiff had grade IV chondromalacia of the knees bilaterally and there was no evidence of internal instability in the patellofemoral joints. (R. 148). However, he also opined that Ms. Moberg should avoid prolonged standing and frequent flexion while she undergoes treatment. (R. 153). Dr. Virgilio concluded that Ms. Moberg should be treated conservatively with physical therapy and bracing. (R. 148).

Dr. Steven Bielski's August 5, 2004 office notes reveal that the plaintiff weighed 205 pounds, with a blood pressure reading of 126/80 and a pulse of 76.

At a follow-up appointment of the plaintiff's gynecologic examination, Dr. Meera C. Kataria noted that there was no improvement in her menometrorrhagia, although the plaintiff had only been on Provera for a month. Ms. Moberg decided to discontinue use of Provera and try Aygestin. Dr. Kataria informed Ms. Moberg that the medication may take three months to see a significant effect. Dr. Kataria also prescribed Celebrex for pain and suggested that Ms. Moberg continue taking iron

supplements to treat her anemia.

August to September 2004 treatment notes reveal that the plaintiff's blood pressure was 118/90, 140/90, and 131/80 and she weighed 204 pounds. (R. 173-75). Dr. Starrett noted that on August 17, 2004 the plaintiff was off her blood pressure medication and also gave the plaintiff information regarding a low calorie diet. (R. 175). In addition, Dr. Starrett noted that the plaintiff had a compensated sinus rhythm; however, on September 21, 2004, he noted that it had resolved. The plaintiff also complained of pain in her left shoulder. (R. 174).

Following her complaints of shoulder pain, on September 22, 2004, Ms. Moberg underwent an MRI of her cervical spine. The MRI revealed that the plaintiff's cervical vertebral bodies were of normal height and signal intensity and her vertebral alignment was normal. The plaintiff's C2-C3 and C3-C4 intervertebral discs were normal; however, a small central non compressive protrusion was seen at C4-C5 and the C5-C6 levels. (R. 177).

In relation to Ms. Moberg's complaints of shoulder pain, she was also referred to Dr. Bernard G. Wolf, who examined the plaintiff on September 28, 2004. (R. 171). During her visit, Ms. Moberg explained that the pain in her shoulder appeared to correlate with picking up her 20 pound grandson. (Id.) In response, Dr. Wolf explained how to lift her grandson in a different manner. (R. 172). A neurological examination revealed

9

that the plaintiff had some discomfort in the left acromioclavicular joint and supraspinatus muscle. (R. 171). Dr. Wolf also noted that the plaintiff's strength was adequate bilaterally, although she did have some pain in abducting the left arm the first 15 degrees and there was no atrophy, abnormal tone, or fascicullations. (*Id.*) He further noted that Ms. Moberg suffered from restless leg syndrome and prescribed 10/100 qhs of Sinemet. (*Id.*)

On October 4, 2004, the plaintiff underwent an Electromyography (EMG) and a nerve conduction velocity and latency study at the recommendation of Dr. Wolf, the results of which were normal. (R. 187-88).

Ms. Moberg saw Marshall G. Balding, a podiatrist, on June 14, 2005, who diagnosed her with plantar fasciitis, right. (R. 193). On July 27, 2005, the plaintiff's blood pressure was 145/72. (R. 220). The plaintiff was also examined on September 22, 2005, with a blood pressure of 170/88. (R. 203). During this visit, the plaintiff was advised to quit smoking and was told that hyertension, smoking, obesity, along with her family history were all risk factors for heart disease and stroke. (R. 204). On September 23, 2005, Ms. Moberg visited Dr. Jamil Jacobs-El at Dreyer Medical Clinic, at a weight of 214 pounds. (R. 221). The plaintiff had a left antalgic gait, but minimal effusion. (*Id.*) Ms. Moberg told Dr. Jacobs-El that she had six

weeks of physical therapy, but it had not helped. (*Id.*) Dr.
Jacobs-El found the plaintiff's strength and bilateral straight
leg raising in the lower extremities to be normal. (R. 222).
Dr. Jacobs-El assessed the plaintiff with end-stage left knee
patellofemoral chondromalacia related to obesity and injected her
left knee with a 2:3 mix of Depo 40 and Marcaine 0.25%. (*Id.*)
He also recommended that Ms. Moberg undergo weight loss and a
conditioning program. (*Id.*)

On December 1, 2005, an examination of Ms. Moberg revealed
that her blood pressure was 150/100. (R. 202). The examining
physician noted that the plaintiff's hypertension was poorly
controlled and advised her to continue weight loss and a low salt
diet. (*Id.*) An MRI on March 13, 2006, of the plaintiff's lumbar
spine, showed minimal disc space narrowing at L4-5 and L5-S1,
minimal anterior osteophytes of the lumbar spine, and minimal
dextroscoliosis of the lumbar spine (R. 215). A nerve conduction
velocity and latency study of the plaintiff's upper extremities
was conducted on March 20, 2006, the results of which were
compatible with a mild right compression neuropathy of the median
nerve across the wrist. (R. 212).

### 4.    The ALJ's Decision

On April 21, 2006, the ALJ issued a written decision,
concluding that based upon the evidence presented, the plaintiff
was not "disabled" as defined by the Act. The ALJ found that the

11

plaintiff suffered from the following severe impairments:
"chondromalacia, bilateral knees, thyroid disease, degenerative
disc disease, [and] neck." (R. 16). The ALJ admitted that the
plaintiff's impairments significantly limited her ability to do
basic work-related activities, but despite that finding,
determined that the plaintiff did not have an impairment or
combination of impairments that meets or medically equals one of
the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1.

In assessing the plaintiff's residual functional capacity
("RFC"), the ALJ determined that the plaintiff retained the
"capacity to do sedentary work, lift/carry 10 pounds frequently,
20 pounds at a time; stand 2 hours, sit 6 hours, during an 8-hour
workday, with sit/stand option every 45 minutes; occasional
stairs, no ladders, occasional stooping, crouching, crawling and
balancing." (R. 17). In explaining his finding, he noted that
the "medically determinable impairments could reasonably be
expected to produce the alleged symptoms [Ms. Moberg complained
of], but that [her] statements concerning the intensity, duration
and limiting effects of these symptoms are not entirely
credible," finding that the objective medical evidence did not
fully support the plaintiff's complaints. (R. 17). The ALJ
admitted that the plaintiff's impairments significantly limited
her ability to do basic work-related activities, but found that
"there are jobs that exist in significant numbers in the national

economy that [she could] perform." (R. 16, 19).

A district court reviewing an ALJ's decision must affirm if
the decision is supported by substantial evidence and is free
from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290
F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "more
than a mere scintilla"; rather, it is "such relevant evidence as
a reasonable mind might accept as adequate to support a
conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).
In reviewing an ALJ's decision for substantial evidence, the
Court may not "displace the ALJ's judgment by reconsidering facts
or evidence or making credibility determinations." *Skinner v.
Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (citing *Jens v.
Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)). Where conflicting
evidence allows reasonable minds to differ, the responsibility
for determining whether a claimant is disabled falls upon the
Commissioner, not the courts. *Herr v. Sullivan*, 912 F.2d 178,
181 (7th Cir. 1990).

While an ALJ need not address every piece of evidence in the
record, he must articulate his analysis by building an accurate
and logical bridge from the evidence to his conclusions, so that
the Court may afford the claimant meaningful review of the SSA's
ultimate findings. *Sims v. Barnhart*, 309 F.3d 424, 429 (7th Cir.
2002). It is not enough that the record contains evidence to

13

support the ALJ's decision; if the ALJ does not rationally
articulate the grounds for that decision, or if the decision is
not sufficiently articulated, so as to prevent meaningful review,
the Court must remand.  *Id.*

## SOCIAL SECURITY REGULATIONS

An individual claiming a need for DBI or SSI must prove that
he or she has a disability under the terms of the SSA.  In
determining whether an individual is eligible for benefits, the
social security regulations require a sequential five step
analysis.  First, the ALJ must determine if the claimant is
currently employed; second, a determination must be made as to
whether the claimant has a severe impairment; third, the ALJ must
determine if the impairment meets or equals one of the
impairments listed by the Commissioner in 20 C.F.R. Part 404,
Subpart P, Appendix 1; fourth, the ALJ must determine the
claimant's RFC, and must evaluate whether the claimant can
perform his or her past relevant work; and fifth, the ALJ must
decide whether the claimant is capable of performing work in the
national economy.  *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir.
1995).  At steps one through four, the claimant bears the burden
of proof; at step five, the burden shifts to the Commissioner.
*Id.*

## DISCUSSION

**A.    Step 2 and Step 3 Determinations**

14

Ms. Moberg argues that the ALJ erred in his step-two determination because he failed to consider several severe impairments (obesity, tremor, tachycardia, restless leg syndrome, fatigue, left shoulder pain, pain, plantar fasciitis, and menorrhagia) that reduce Claimant's ability to perform basic work-related activities. Plaintiff, therefore, maintains that it is not clear whether the ALJ considered all of her impairments at step-three. However, a closer read of the ALJ's decision reveals some inaccuracy in Plaintiff's claims.

First, throughout the two-year period of alleged disability, beginning on February 1, 2004 and leading up to the hearing before the ALJ on March 13, 2006, there is no evidence that Plaintiff suffers from a tremor, tachycardia, or fatigue. Rather, any mention of those impairments date back to a time period prior to Ms. Moberg's onset date of disability; therefore, the ALJ was not obligated to consider them in his analysis. (R. 124, 137, 141).

Second, the ALJ did consider the plaintiff's complaint of restless leg syndrome. The ALJ specifically noted in his step-three evaluation that Ms. Moberg "takes medication for restless leg syndrome." (R. 17). A reading of his opinion as a whole, rather than in isolation, reveals that the ALJ considered the plaintiff's restless leg syndrome, but did not find that it, by itself or in combination, met or medically equaled one of the

15

listed impairments. In his explanation as to why the plaintiff does not have one of the listed impairments, the ALJ wrote that he "considered the medical findings reported by medical sources and all other available information about the claimant's medical conditions and its effects, *including the [plaintiff's] own description of her impairments.*" (R. 17) (emphasis added). In the next section of his decision, the ALJ then summarized the plaintiff's testimony regarding her impairments, noting that she "takes medication for restless leg syndrome." (*Id.*) Moreover, the ALJ also considered Plaintiff's testimony of shoulder pain, noting Ms. Moberg's testimony that "[s]he stopped babysitting in 2005, because she could not lift the child due to shoulder pain." (*Id.*) Likewise, the ALJ also noted that Ms. Moberg testified that "when she sits for an hour pain will be in [her] knees and neck" and further noted that she has taken Vicodin to treat the pain. (*Id.*) However, once more the ALJ did not find that the pain and shoulder pain, by itself or in combination, met or medically equaled one of the listed impairments.

Third, in his analysis of the objective medical evidence, the ALJ noted that the record contained evidence of plantar fasciitis, right. (R. 18). As for Plaintiff's menorrhagia (excessive menstruation), there was no testimony or medical evidence regarding the effect of this diagnosis on her condition that may have effected the ALJ's conclusion that Plaintiff did

not have a listed impairment.. The ALJ need not address every piece of evidence in the record, especially if it does not shed light on the plaintiff's ability to engage in substantial gainful activity. *Sims v. Barnhart*, 309 F.3d 424, 429 (7th Cir. 2002). However, the Court does find some merit in Plaintiff's complaint that the ALJ did not sufficiently discuss her obesity in his analysis.

Although obesity was removed from the Listing of Impairments in 20 CFR, Subpart P, Appendix 1, the Social Security Administration has released guidelines explaining how to evaluate obesity in social security disability claims. ALJ's are to conduct "an individualized assessment of the impact of obesity of an individual's functioning when deciding whether the impairment is severe." SSR 02-1p. Obesity may also be a factor in both the "meets" and "equals" determinations. The ALJ is to "find that a listing is met if there is an impairment that, in combination with obesity, meets the requirements of a listing." *Id.* In addition, obesity may increase the severity of coexisting or related impairments. When evaluating obesity, an ALJ may also find that obesity by itself is medically equivalent to a listed impairment. SSR 02-1p provides some guidance with an example:

> If the obesity is of such a level that it results in an
> inability to ambulate effectively, as defined in
> sections 1.00B2b or 101.00B2b of the listings, it may
> substitute for the major dysfunction of a joint(s) due
> to any cause (and its associated criteria), with the
> involvement of one major peripheral weight-bearing

joint in listing 1.02A or 101.02A, and we will then
make a finding of medical equivalence.

However, the ALJ is "not to make assumptions about the severity
or functional effects of obesity combined with other impairments"
because "[o]besity in combination with another impairment may or
may not increase the severity or functional limitations of the
other impairment." *Id.* Rather, the ALJ is to evaluate each case
based on the information in the record.

The ALJ does mention that Plaintiff's end-stage left knee
patellofemoral chondromalacia was related to her obesity, but his
failure to discuss the affect of Plaintiff's obesity, if any, in
general and combined with her other impairments, forces this
court to speculate as to whether he has followed the SSA's
policies regarding the role of obesity in disability claims. It
is quite possible that the ALJ will still find that Plaintiff
does not have an impairment or combination of impairments that
meets or medically equals one of the listed impairments, but his
failure to apply the analysis outlined in SSR 02-1p, prevents any
meaningful review of what affect the ALJ found obesity to have on
Plaintiff's condition, and makes remand the appropriate course of
action.

In addition, the Court finds that the ALJ failed to
adequately discuss how he came to the determination that
Plaintiff's medical condition does not meet or equal any listing,
including, 1.02, 1.04 or 9.02. Instead, he simply stated that he

18

considered the medical findings and all other information
regarding Plaintiff's medical condition, but provided no
analysis.  *Briscoe ex rel. v. Barnhart*, 425 F.3d 345, 351 (7th
Cir. 2005) ("[T]he ALJ must also explain his analysis of the
evidence with enough detail and clarity to permit meaningful
appellate review.")  Again, this does not mean that the ALJ came
to the wrong result, but rather his decision does not assist the
Court in conducting the kind of meaningful review required.
Hence, remand on that issue is appropriate.

## B.    The ALJ's Credibility Determination

Next, Plaintiff contends that the ALJ's credibility
determination was patently wrong, because he failed to state his
reasons for his findings on credibility.  The ALJ found that the
objective medical evidence did not fully support Plaintiff's
subjective complaints concerning the intensity, duration and
limiting effects of her symptoms.  In his decision, the ALJ
summarized the objective medical evidence as follows: Plaintiff's
neurological examination was essentially within normal limits,
with only some discomfort in the left AC joint and supraspinatus
muscle, Plaintiff's orthopedic surgeon noted minimal effusion,
significant left antalgic gait and assessed end-stage left knee
patellofemoral chondromalacia relating to obesity, for which he
injected Plaintiff and recommended a weight loss and conditioning
program; evidence of plantar fasciitis right, in response to

19

Plaintiff's pelvic pain, she was told to stop smoking and lose weight. (R. 18). In addition, the ALJ noted that the State Agency consultants gave Plaintiff a light residual functional capacity with occasional postural limitations due to her knees with no internal stability to the joints for which she was treated conservatively with physical therapy and bracing. (Id.) The ALJ also noted that Plaintiff was evaluated for swelling in both legs, with pain and occasional falling asleep of both legs, with cramping in her feet, for which she stated that she had been doing a little bit better the last two days, Dr. Karlsson, the treating physician, told her that she could not be treated surgically but instead with physical therapy and possibly bracing. (Id.) A cardiovascular stress test was normal, a thyroid evaluation showed a markedly elevated six hour uptake of 40%, which correlated with hyperthyroidism, and an earlier history of chest pains appeared to be atypical. (Id.)

The ALJ's assessment of credibility sheds some light on his analytical journey leading to his credibility determination. However, the Court could benefit from some clarification regarding the ALJ's logical bridge from the evidence to his conclusion that Plaintiff's subjective complaints were not entirely credible. In other words, the ALJ's summarization of the evidence that he considered in reaching his determination, does not give the Court full insight as to how he came to his

ultimate conclusion. *Sims v. Barnhart,* 309 F.3d at 429. The ALJ's credibility determination appears to have some support in the record, however, because his analysis comes close, but is not clearly articulated, the Court will remand for further explication of this issue. Having said that, the Court does not intend to be overly critical here. If this case were not being remanded on the step 2 determination and the issue of obesity, the Court would not deem remand necessary on this issue.

### C. Step 4 and Step 5 Determinations

Lastly, Plaintiff claims that the ALJ's step 4 and step 5 determinations were erroneous. The ALJ determined that, based on Plaintiff's current RFC, she is unable to perform any past relevant work, but that considering her "age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2," she can perform a full range of sedentary work. (R. 19). The ALJ noted that the VE identified, "41,300 unskilled sedentary jobs, including 31,000 office clerk jobs" that Plaintiff could perform. (*Id.*)

Plaintiff calls the Court's attention to Plaintiff's complaints of fatigue, and argues that the ALJ did not consider these complaints of fatigue in his step 5 analysis. However, there is no indication that in assessing Ms. Moberg's impairments the ALJ gave insufficient weight to Plaintiff's complaints of fatigue, which anyway were not substantial. Plaintiff cites

21

three references of fatigue in the record. The first is a form completed by Plaintiff, in which she complains that her thyroid makes her "very tired." (R. 17). A reference by the Plaintiff of being "very tired" certainly does not qualify as the kind of disabling fatigue considered by the SSA. Plaintiff also cites a second document entitled, *Activities of Daily Living Questionnaire for Physical Impairments* as evidence of her fatigue, however, this fails to offer adequate support to her claim. While she did mention that she needs to rest every 10 to 20 minutes when shopping or preparing a meal and she requires rest periods during the day after house chores, she failed to specify the reason(s) why she could not perform these tasks (e.g. whether it was due to her obesity, meaning the stress on her knees or because of shortness of breath, etc.) Additionally, it is not clear that an explanation for the need for rest periods would support a finding of fatigue. In the third document, dated September 11, 2003, Dr. Sayeed noted that *after* exercising for a total of 5.45 minutes, the stress test was terminated "due to generalized fatigue and shortness of breath." (R. 141). Again, this reference also falls short. Moreover, at the hearing, Plaintiff did not testify that she suffered from fatigue at all. In fact, when asked whether she could walk, she testified that she could only walk for 15 minutes, because her knees and back start to hurt. (R. 239).

22

Additionally, Plaintiff argues that the ALJ failed to discuss her obesity and chondromalacia, bilateral knees in his RFC analysis, and therefore, his step 5 evaluation is faulty. This Court does not agree with Plaintiff's characterization of the evidence. In his analysis of Plaintiff's RFC, the ALJ noted that Plaintiff had "end-stage left knee patellofemoral chondromalacia related to obesity." (R. 18). However, as discussed above, the ALJ failed to discuss Plaintiff's obesity in general or in combination with Plaintiff's other ailments, therefore, the Court is unable to determine whether the ALJ's RFC finding is supported by substantial evidence. Although Plaintiff's obesity was mentioned throughout the record, there is no evidence that the ALJ independently considered its effects.[2]

Plaintiff further argues that the ALJ posed an incomplete hypothetical question to VE Breen. In particular, Ms. Moberg contends that the ALJ failed to incorporate her complaints of her mental condition, namely her inability to focus or concentrate and also her experiences of pain to the hypothetical posed to the VE. It is important to note that "a vocational expert is not a required or even essential part of a disability benefits hearing" and the "decision whether to employ the services of a vocational expert is entirely within the discretion of the ALJ." Ehrhart v.

---

[2]Plaintiff again mentions that the ALJ failed to consider fatigue in combination with Plaintiff's other impairments. However, as the Court explained, supra p. 21, Plaintiff fails to point to any evidence of fatigue in the record, hence, the Court will not consider this claim.

Sec'y of Health and Human Servs., 969 f.2d 534, 540 (7th Cir. 1992). It is only required that "there be reliable evidence of some kind that would persuade a reasonable person that the limitations in question do not significantly diminish the employment opportunities otherwise available." *Id.* (Citations omitted). Furthermore, the question posed by the ALJ "need not take into consideration every detail of the claimant's impairments." *Herron v. Shalala*, 19 F.3d 329, 337 (7th Cir. 1994).

While the question posed by the ALJ to the VE and the ALJ's decision in general, need not address every piece of evidence in the record, it is evident that the ALJ did in fact consider Plaintiff's testimony of forgetfulness and pain in his decision.

The ALJ posed the following question to the VE:

whether a person of 39 years of age, with a GED
education, who could lift ten pounds frequently, twenty
pounds occasionally, can stand an eight-hour day, sit
six hours in an eight-hour day, with a sit/stand option
every forty-five minutes, occasional stairs, no
ladders, occasional stoop, crouch, crawl, and requiring
the occasional balance, could perform [Plaintiff's]
work history.

(Hr'g Tr. 252). This question does not specifically address Plaintiff's complaints of forgetfulness or pain; however, in his decision, the ALJ found the hypothetical cited above to be the Plaintiff's RFC based on the evidence in the record, including her testimony of pain in her neck, knees, and shoulder and pain she experiences while climbing stairs. (R. 17). Also, it was

24

the ALJ who questioned Plaintiff regarding her forgetfulness during the hearing and the ALJ noted in his decision that he considered the mental symptoms of the Plaintiff. *Id.* Therefore, remand is not necessary on this issue.

## CONCLUSION

For the reasons set forth above, the Court GRANTS Plaintiff's Motion for Summary Judgment, in part, remanding the matter back to the Commissioner for further action consistent with this Opinion and DENIES the Commissioner's Motion for Summary Judgment.

Date: April 7, 2008          E N T E R E D:

Arlander Keys

MAGISTRATE JUDGE ARLANDER KEYS
UNITED STATES DISTRICT COURT